UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MONICA HUTCHESON,           :
o/b/o A.M.,                 :CIVIL ACTION NO. 3:16-CV-2023
                            :
        Plaintiff,          :(JUDGE CONABOY)
                            :
        v.                  :
                            :
NANCY A. BERRYHILL,         :
Acting Commissioner         :
of Social Security,         :
                            :
        Defendant.          :
                            :
_____

**MEMORANDUM**

The above-captioned matter concerns Plaintiff Monica
Hutcheson's appeal from the Acting Commissioner's denial of
Security Supplemental Income ("SSI") for her minor son, "A.M."
(Doc. 1.)  Plaintiff filed an application for benefits on September
10, 2013, alleging a disability onset date of March 1, 2011.  (R.
15.)  After Plaintiff appealed the initial denial of the claims, a
hearing was held on February 23, 2015, and Administrative Law Judge
("ALJ") Scott M. Staller issued his Decision on March 13, 2015,
concluding that A.M. had not been under a disability from the date
of the application through the date of the decision.  (R. 24.)
Plaintiff requested review of the ALJ's decision which the Appeals
Council denied on August 4, 2016.  (R. 1-6.)  In doing so, the
ALJ's decision became the decision of the Acting Commissioner.  (R.
1.)

Plaintiff filed this action on October 5, 2016.  (Doc. 1.)

She asserts in her supporting brief that the Acting Commissioner's determination should be reversed or remanded for the following reasons: 1) the ALJ erred in finding that A.M. had less than a marked limitation in acquiring and learning new information and in attending and completing tasks; 2) the ALJ erred in failing to accord proper weight to a treating source opinion; and 3) the ALJ erred in failing to credit A.M.'s statements to his treating physician after finding him generally credible. (Doc. 18 at 8.) After careful review of the record and the parties' filings, the Court concludes this appeal is properly denied.

## I. Background

### A. Treatment Records

### 1. Primary Care Physician

A.M., who was born on September 3, 2003 (R. 13), was followed by primary care physician, Jane K. Conroy, D.O. (R. 414.) She noted in April 2011 that Plaintiff reported some difficulty managing him, he did not stay on task, and school personnel had also noted some problems with this. (R. 414.) Dr. Conroy suggested a developmental assessment. (*Id.*)

In May 2011, Dr. Conroy recorded that A.M. had been evaluated by a psychologist "who felt he had ADHD identifiers with mood lability and apparently oppositional defiance symptoms." (R. 413.) She added that A.M. was in first grade at the time and his mother reported he was doing adequately academically but had behavior

difficulties. (*Id.*)  Exam notes include the observation that A.M. was very active and busy during the exam period, but he sat and followed instructions when Dr. Conroy asked him to.  (R. 412.)

August 16, 2011, office notes indicate that Dr. Conroy received a call from psychologist Michael Zug who suggested an antidepressant for A.M. due to increased irritability and easy frustration.  (R. 410.)  Dr. Conroy noted that she first wanted a pediatric psychiatry evaluation which Mr. Zug said he would arrange.  (*Id.*)

At a follow up visit in October 2011, Plaintiff continued to report A.M.'s easy distractability and defiance issues.  (R. 408.) Dr. Conroy noted that ADHD and easy distractability were witnessed in the office as well as Plaintiff's frustration with his behaviors.  (*Id.*)  Dr. Conroy adjusted A.M.'s medications and encouraged Plaintiff to attend counseling for parenting help to deal with ADHD.  (*Id.*)

In March 2014, Dr. Conroy saw A.M. for complaints of headache. (R. 402.)  Office notes indicate that there was no problem with other children at school and A.M.'s grades were good (better than the year before).  (*Id.*)

At a June 2012 office visit for check of eye irritation, Dr. Conroy noted A.M. was restless but he sat through the exam, needing to be prompted to sit and not impulsively get off the table to grab gloves and equipment.  (R. 404.)

## 2. **Treating Psychiatrist Office Records**

A.M. had a psychiatric evaluation with Benyam Tegene, M.D., in November 2011. (R. 258.) Plaintiff's chief complaint was that A.M. "acts out a lot." (*Id.*) Under "School History," Dr. Tegene recorded that A.M. was in second grade attending regular classes and he did well in math, he was behind in reading, and he got no extra help. (R. 259.) Dr. Tegene noted that A.M. made good eye contact and had no psychomotor agitation or retardation. (*Id.*) He also observed that A.M. mocked his mother and made faces and was mildly restless and fidgety. (*Id.*) Dr. Tegene diagnosed ODD, ADHD, combined type, and he assessed a GAF of 52. (*Id.*) He recommended increasing medication dosage as well as individual and family therapy to address coping skills and help with parenting issues and behavior modification. (*Id.*) Dr. Tegene planned to see Plaintiff in two weeks and have A.M.'s teachers complete questionnaires. (*Id.*)

In February 2012, Plaintiff reported that A.M. refused to do what he was told at home and she had difficulty parenting him but his behavior at school had improved for the most part. (R. 261.) Dr. Tegene evaluated A.M., finding him cooperative with euthymic mood, affect within normal range, and normal speech. (*Id.*) He also noted that A.M. tests limits and was fidgety. (*Id.*)

In March 2012, A.M. told Dr. Tegene he was able to pay attention in class. (R. 262.) Dr. Tegene's objective evaluation

4

was similar to the previous month with the additional notation that A.M. was defensive and upset when discussing his behavior. (*Id.*)

At the April 2012 visit with Dr. Tegene, subjective reporting indicated that A.M. was doing well--he was getting along with his teachers and friends, paying attention, listening better and making better choices, and he had good ability to concentrate. (R. 263.) Objective evaluation included the finding that A.M.'s attention span and concentration were grossly intact, his judgment was adequate, and his insight was fair. (*Id.*) Dr. Tegene concluded that A.M.'s ADHD was improving and he assessed a GAF score of 62. (*Id.*) He noted that A.M. was in therapy with Michael Zug and he planned to see A.M. in six weeks.[1] (*Id.*)

In May 2012, both A.M. and his mother had positive reports about progress. (R. 265.) Dr. Tegene again noted improving ADHD and a GAF score of 62. (*Id.*) In August, Plaintiff reported that A.M. was hyperactive and always on the go but A.M.'s ability to concentrate was noted to be good, difficulty staying focused was denied, and ability to pay attention had increased. (R. 267.) Dr.

---

[1] The record contains a letter addressed "To Whom It May Concern" from Michael Zug dated November 25, 2013, indicating that he saw A.M. between April 29, 2011, and March 12, 2012, during which time A.M. was referred to Dr. Tegene for psychiatric evaluation. (R. 291.) Mr. Zug reiterated Dr. Tegene's diagnosis of Attention Deficit Disorder, combined type, and Oppositional Defiant Disorder with an assessed GAF score of 62. (*Id.*) The record contains a similar letter from Mr. Zug to Plaintiff's attorney, stating that A.M. was seen twelve times during the April 2011 to March 2012 period. (R. 428.) No treatment notes from Mr. Zug appear in the record.

Tegene again noted improving ADHD and a GAF score of 62. (*Id.*) September office visit notes were similar. (R. 269.)

In October 2012, A.M. related that he was doing well in school, he had good grades, and his concentration had been fair. (R. 271.) Although Dr. Tegene noted that A.M. still got distracted easily and was impulsive, he found A.M.'s thought processes clear and appropriate, his attention span and concentration grossly intact, and he had adequate judgment and fair insight. (*Id.*) November findings were similar and subjective reporting included the notation that A.M. was able to focus better. (R. 273.)

At his visit with Dr. Tegene on February 4, 2013, A.M. demonstrated hyperactive motor activity, and Plaintiff reported he had been doing "alright." (R. 275.) In March, A.M. told Dr. Tegene he had been good and he was noted to be "cooperative, appropriate and happy." (R. 277.) In April, Plaintiff reported that A.M. still did not focus, and he was impulsive and rushed through his school work, more so in the after school reading program. (R. 279.) Although Dr. Tegene observed that Plaintiff demonstrated hyperactive motor activity, his objective evaluation was basically normal. (*Id.*) He continued to assess A.M.'s ADHD to be improving and recorded a GAF score of 62. (*Id.*) In July, Plaintiff again stated that A.M. still did not focus and, although his medication helped, there was room for improvement. (R. 281.)

In September 2013, A.M. reported that he was doing well in

school, he had good concentration but slept in class some days, and he was getting along with friends and his teacher. (R. 283.) Plaintiff reported A.M. had an IEP evaluation in school, his ability to concentrate had decreased but paying attention had increased. (R. 283.) Objective evaluation was basically normal except Dr. Tegene noted A.M. demonstrated hyperactive motor activity. (*Id.*) He continued to assess A.M.'s ADHD to be improving and recorded a GAF score of 62. (*Id.*)

In October 2013, A.M. subjectively reported that he was doing well. (R. 285.) Notes indicate he had been getting positive feedback from teachers, he had an IEP, he was better behaved at home, and he was getting along better with siblings and parents but still needed frequent promptings and redirection. (*Id.*) In March 2014, A.M. continued to report that he was doing well, including paying attention well and getting good grades. (R. 287.) He denied being easily distracted and denied irritability. (*Id.*) Dr. Tegene noted that A.M.'s motor activity was within normal limits and other evaluation findings included grossly intact attention span, concentration, judgment and insight. (*Id.*) Dr. Tegene opined that both ADHD and ODD were improving. (*Id.*) In April, Plaintiff reported that A.M.'s teachers had not complained about his behavior, his grades had been good, he was listening better, he was doing his homework, and he was getting along with his peers and teachers. (R. 289.) Other than mild psycho-motor agitation,

objective evaluation was basically normal. (*Id.*)

At his June 5, 2014, visit with Dr. Tegene, subjective information included reports that A.M. was doing well in school, he was paying attention, his grades had improved, and he was getting some learning support. (R. 417.) Objective evaluation was the same as the previous visit. (*Id.*)

August 7, 2014, office notes indicated A.M. continued to do well and Plaintiff said he was well-behaved and listening better. (R. 419.) Plaintiff also noted improvement with hygiene and increased help with chores. (*Id.*) Objective evaluation remained the same. (*Id.*)

In October 2014, A.M. reported doing his work most of the time though a teacher had called because he was not applying himself in class and he rushed through his work. (R. 421.) A.M. continued to be unhappy dealing with his stepfather but in general had been listening better. (*Id.*) Objective evaluation remained the same. (*Id.*)

A.M. attended his November 14, 2014, appointment with his grandmother. (R. 423.) Subjective reporting indicated A.M. did not like one of his teachers, he had been inattentive and disruptive in class but he did his work, and he had been well behaved at home. (*Id.*) Objectively, Dr. Tegene found A.M.'s motor activity was within normal limits and he did not note any problems. (*Id.*)

In December 2014, Plaintiff told Dr. Tegene that A.M. lied frequently and did not do his homework, his grades were low average, he needed reminders to do basic chores, he did not take responsibility for his actions, he talked back to his teachers, and he did not apply himself in school. (R. 425.) Although Plaintiff expressed frustration that A.M. did not do what he was told, notes indicated he was listening better at home. (*Id.*) Objectively, Dr. Tegene did not note any problems. (*Id.*) He assessed that ADHD and ODD were ongoing and he increased medication dosage. (R. 426.)

At each office visit from April 2014 through December 2014, under the "Subjective" heading in office notes "Symptoms represent significant impairment in functioning in 2 or more settings" was noted without elaboration. (R. 289, 417, 419, 421, 423, 425.)

**B.** *Opinion Evidence*

**1.** <u>**Treating Psychiatrist**</u>

On April 24, 2014, Dr. Tegene completed a "Childhood Medical/Psychological Source Statement of Functional Abilities" providing information about A.M.'s functioning in the six identified domains. (R. 216-19.) In the domain of acquiring and using information, he noted the following: A.M. was hyperactive, impulsive, and inattentive; he met the criteria for ADHD, combined type; he learned new information and was able to retain it but he rushed through his work; he was oriented to time, place, and

person; and he knew his home address and phone number. (R. 217.)
In the domain of attending and completing tasks, Dr. Tergene opined
that A.M. had difficulty focusing and staying on task, he was
easily distracted, he had difficulty finishing projects, and he was
easily bored. (*Id.*) In the domain of interacting and relating to
others, Dr. Tergene reported the following: A.M. did not have any
close friends––he enjoyed being with others but he did not respect
personal boundaries; he did not comply with rules, tested limits,
and challenged authority; he did not accept criticism and was
sensitive; and he was able to speak fluently and express himself
well. (R. 218.) In the domain of moving about and manipulating
objects, Dr. Tergene noted that A.M. liked to play outside and was
well coordinated but he had difficulty paying attention and did not
listen to his coach when he played soccer. (*Id.*) He added that
A.M. knew how to ride a bike, his handwriting was sloppy, and he
was impulsive and inattentive. (*Id.*) In the domain of caring for
self, Dr. Tergene reported that A.M. needed to be reminded to do
basic chores and self-care, he would go days without brushing his
teeth or changing clothes, his room was poorly organized, he was a
picky eater, and he rushed through things. (R. 219.) In the
domain of health and physical well-being, Dr. Tegene noted that
A.M. takes advil for headaches, he was physically well-developed
for his age, and he was on Focalin twice daily with the side effect
of decreased appetite. (*Id.*)

## 2.   **Teacher Opinions**

On November 27, 2013, Kathie Lee completed a Teacher Questionnaire.  (R. 124-31.)  She had seen A.M. every other day for eight months as a learning support teacher for reading, language arts, and math.  (R. 124.)  Of the thirteen subparts in the "Attending and Completing Tasks" category, Ms. Lee identified three areas where A.M. had serious problems: "Focusing long enough to finish assigned activity or task"; "Refocusing to task when necessary"; and "Organizing own things or school materials."  (R. 129.)  She added that A.M. "benefits from daily support in all areas.  I checked many of the areas above as problems but w/current SDIs he is able to maintain."  (*Id.*)  Of the thirteen subparts in the "Interacting and Relating with Others" category, Ms. Lee identified two areas where A.M. had serious problems: "Seeking attention appropriately"; and "Expressing anger appropriately." (R. 130.)  Of the ten subparts of the "Acquiring and Using Information" category, Ms. Lee identified four areas where A.M. had serious problems: "Understanding school and content vocabulary"; "Reading and comprehending written material"; "Providing organized oral explanations and adequate descriptions"; and "Expressing ideas in written form."  (R. 131.)  Ms. Lee added that A.M. had recently been diagnosed as a student with "OHI and a SLD in written expression.  He benefits from small group instruction & positive redirection. [A.M.] continues to show progress with specific goals

11

and specially designed instruction." (*Id.*)

On January 20, 2015, A.M.'s fifth grade teachers, Jason Koch and Carrie Martin, completed a Teacher Questionnaire. (R. 161-68.) They indicated that A.M. was at the fourth grade level for reading, math and written language and that he received daily learning support in these areas. (R. 161.) In the area of "Acquiring and Using Information," they identified serious problems in five of the ten subparts: "Reading and comprehending material"; "Comprehending and doing math problems"; "Providing organized oral explanations and adequate descriptions"; "Expressing ideas in written form"; "[L]earning new material"; and "Applying problem-solving skills in class discussions." (R. 162.) They noted that A.M. exhibited "extreme attention seeking behaviors. . . . [He] is capable of attending to, engaging in, and completing grade level tasks. However, when left to work independently in *any* capacity, he is completely off-task and unfocused unless someone works with him one on one." (*Id.*) In the area of "Attending and Completing Tasks," of the thirteen subparts, they identified serious problems in four categories and very serious problems in seven categories. (R. 163.) They found that A.M. had serious problems in the following areas: "Carrying out single-step instructions"; "Waiting to take turns"; "Changing from one activity to another without being disruptive"; and "Working without distracting self or others." (*Id.*) They found very serious problems in the following areas:

"Focusing long enough to finish assigned activity or task"; "Refocusing to task when necessary"; "Carrying out multi-step instructions"; "Organizing own things or school materials"; "Completing class/homework assignments"; "Completing work accurately without careless mistakes"; and "Working at reasonable pace/finishing on time."  (R. 163.)  In the area of "Interacting and Relating with Others," the teachers indicated a serious problem with "Expressing anger appropriately" and a very serious problem with "Seeking attention appropriately"; ratings ranged from no problem to obvious problem in the remaining eleven subparts.  (R. 164.)  In the area of "Caring for Himself or Herself," the teachers identified serious problems in five of the ten subparts: "Handling frustration appropriately"; "Being patient when necessary"; "Identifying and appropriately asserting emotional needs"; Responding appropriately to changes in own mood (e.g. calming self); "Using appropriate coping skills to meet daily demands of school environment."  (R. 166.)  They noted that A.M.'s mood was stable and he was not disruptive when he took his medication but he still did not complete his work.  (R. 167.)  Specifically, the teachers state "[m]edication *does* help however it doesn't do anything for [A.M.'s] constant need for attention which affects his academic performance."  (*Id.*)  They also commented that a therapeutic support staff (TSS) would be good for A.M. to redirect him and keep him focused on completing tasks.  (R. 168.)

### 3. __State Agency Consultant Opinion__

On December 3, 2013, Karen Weitzner, Ph.D., reviewed evidence and provided a Childhood Disability Evaluation. (R. 48-55.) She concluded that A.M. had the severe impairments of ADD/ADHD and Learning Disorder and considered the child listings of ADHD and Organic Mental Disorders. (R. 51.) Because Dr. Weitzner concluded that the impairments did not meet or equal a listing, she considered whether the impairments functionally equaled a listing. (*Id.*) In so doing, Dr. Weitzner made the following findings: 1) "Acquiring and Using Information" rating was "Less Than Marked"; 2) "Attending and Completing Tasks" rating was "Less Than Marked" with the added notation that "Claimant is showing improvement in his ability to sustain attention and complete tasks based on progress notes from psychiatrist [and] [h]e continued to need some supports and intervention"; 3) "Interacting and Relating With Others" rating was "Less Than Marked"; 4) "Moving About and Manipulation of Objects" rating was "No Limitation"; 5) "Caring For Yourself" rating was "Less Than Marked"; and 6) "Health and Physical Well-Being" rating was "No Limitation." (R. 51-52.)

## C. *Hearing Testimony and Function Report*

### 1. __Hearing Testimony__

Plaintiff and A.M. testified at the February 23, 2015, hearing. (*See* R. 29.) A.M. testified that he helped take care of his two-year-old brother and the family dog, and he has two friends

in his neighborhood. (R. 34.) He said his chores included taking out the trash but he doesn't always do it. (R. 35.) A.M. said he "mostly" gets along with his fifth grade teacher and explained he answered "mostly" because he had problems if he didn't take his pill. (R. 36.) A.M. testified that he sometimes disrupted the class by acting silly and not doing his work, and he was able to do work on his own at times but needed help at other times. (R. 36-37.) He also said he was in regular classes, he got along with other students, and he did not get into fights. (R. 38.)

After A.M. left the hearing room, Plaintiff confirmed that he rarely forgets to take his medication, he's on the go all the time, and he had to be reminded constantly about what you want him to do. (R. 41-42.) When asked how long A.M. was able to pay attention at one time, Plaintiff responded that it depended on what he was doing--a video game would hold his attention more than school work but he would only play a video game for ten to fifteen minutes before he was "off to the next thing." (R. 42-43.) Regarding A.M.'s school performance, Plaintiff said the teacher said he needed a lot of one-on-one attention and often did not do his work without it. (R. 43.) She said the school was talking about getting a TSS (therapeutic support staff) for him. (*Id.*) Plaintiff said A.M. does not take out the trash without being reminded and he also needed to be reminded to change clothes and take a shower. (R. 44.) She added that Plaintiff had seven baby

15

teeth pulled because he did not brush his teeth.  (R. 44-45.)

A.M.'s attorney urged the ALJ to give the teacher questionnaire substantial weight and, under the equivalency guidelines, the attending and completing tasks domain was extreme or at least marked and, if found marked, the caring for self domain was marked as well.  (R. 45.)

## 2.   **Function Report**

Plaintiff completed a "Function Report - Child" on Novmeber 4, 2013.  (R. 103-14.)  She indicated that A.M.'s ability to communicate was limited in all categories identified, his ability to progress in learning was limited in all but one category identified, his impairments affected his behavior with other people in all identified categories, and his ability to pay attention and stick with a task was limited in all identified categories.   (R. 106, 107, 109, 111.)  Plaintiff provided no additional explanation in any category.  (*Id.*)

## D.   *ALJ Decision*

In his March 13, 2015, Decision, ALJ Staller's findings included the following: A.M. had the severe impairments of attention deficit-hyperactivity disorder (ADHD), oppositional-defiant disorder (ODD), and a learning disorder; his impairments did not meet or equal the severity of a listed impairment; he did not have an impairment or combination of impairments that functionally equaled the severity of the listings; and he had not

16

been disabled since the date of the application, September 10, 2013.  (R. 13-24.)  Regarding functional equivalency, ALJ Staller made the following findings: 1) the claimant had less than marked limitation in acquiring and using information; 2) the claimant had less than marked limitation in attending and completing tasks; 3) the claimant had less than marked limitation in interacting and relating to others; 4) the claimant had no limitation in moving about and manipulating objects; 5) the claimant had less than marked limitation in caring for yourself; and 6) the claimant had no limitation in health and physical well-being.  (R. 19-24.) Other relevant portions of the ALJ's Decision will be referenced in the Discussion section of this Memorandum.

## II. Disability Determination Process

The federal Supplemental Security Income program provides benefits to disabled individuals who meet certain statutory income and resource limitations.  42 U.S.C. § 1381.  The relevant statutory provision states that

> [a]n individual under the age of 18 shall be considered disabled for the purposes of this subchapter if that individual has a medically determinable physical or mental impairment, which results in marked and severe limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 1382c(a)(3)(C)(i).  Pursuant to 20 C.F.R. § 416.924, disability for children is determined using a three-step analysis:

17

1) whether the child is engaging in substantial gainful activity;
2) whether the child has a "severe" impairment or combination of
impairments that is "severe"; and 3) whether the impairment or
combination of impairments meets, medically equals, or functionally
equals the listings.  20 C.F.R. § 416.924(a).  At step three, a
child's impairment meets or medically equals a listed impairment if
the impairment meets all criteria contained in the regulations.
*See Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).

Relevant to this case is the inquiry of whether the child's
impairment or combination of impairments meets or functionally
equals the listing for Attention Deficit Hyperactivity Disorder,
listing 112.11.  (*See* Doc. 18 at 9.)  Under listing 112.11, the
child's ADHD meets the required level of severity when there are
medically documented findings of marked inattention, marked
implusiveness, and marked hyperactivity, and there is a "marked
impairment in at least two of the following:
cognitive/communicative function, social functioning, personal
functioning, or concentration, persistence, or pace.  20 C.F.R. Pt.
405, Subpt. P. Appx. 1, § 112.11.

Functional equivalence of a child's impairment is explained in
20 C.F.R. 416.926a:

> If you have a severe impairment or
> combination of impairments that does not meet
> or medically equal a listing, we will decide
> whether it results in limitations that
> functionally equal the listings.  By
> "functionally equal the listings," we mean

18

> that your impairment(s) must be of listing-
> level severity; i.e., it must result in
> "marked" limitations in two domains of
> functioning or an "extreme" limitation in one
> domain.

20 C.F.R. § 926a(a). General factors to be considered include the following: 1) how well the claimant can initiate and sustain activities, how much extra help is needed, and the effects of structured or supportive settings; 2) how the claimant functions in school; and 3) the effects of medication and other treatment. *Id.* The six domains of functioning are: "(i) Acquiring and Using Information; (ii) Attending and Completing Tasks; (iii) Interacting and Relating with Others; (iv) Moving about and Manipulating Objects; (v) Caring for Yourself; and (vi) Health and Physical Well-being." 20 C.F.R. § 416.926a(b)(1). A limitation is "marked" when it "interferes seriously with your ability to independently initiate, sustain, or complete activities" and "marked" limitation "also means a limitation that is more than moderate but less than extreme." 20 C.F.R. § 416.926a(e)(2)(i). A limitation is "extreme" if the "impairment(s) interferes very seriously with your ability to initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i).

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision. 42 U.S.C. § 405(g); *Hartranft*

19

*v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.  A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence-- particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion.  *See* [*Cotter*, 642 F.2d] at 706 ("'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted).  The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the ALJ to analyze all probative evidence and set out the reasons for his decision.  *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119-20 (3d Cir. 2000) (citations omitted).  If he has not done so and has not

sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979). In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07. However, the ALJ need not undertake an exhaustive discussion of all the evidence. *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . ."). "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary,

in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). Where a claimed error would not affect the outcome of a case, remand is not required. *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005). Finally, an ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

Plaintiff asserts that the Acting Commissioner's determination should be reversed or remanded for the following reasons: 1) the ALJ erred in finding that A.M. had less than a marked limitation in acquiring and learning new information and in attending and completing tasks; 2) the ALJ erred in failing to accord proper weight to a treating source opinion; and 3) the ALJ erred in failing to credit A.M.'s statements to his treating physician after finding him generally credible. (Doc. 18 at 8.)

### A. *Domain of Acquiring and Using Information*

Although Plaintiff asserts error on the basis of the ALJ's consideration of the domain of acquiring and using information, no specific argument is made in support of this error in Plaintiff's supporting brief. (*See* Doc. 18 at 13-16.) Defendant notes in her responsive brief that Plaintiff did not make any argument about A.M.'s ability to learn and acquire new information. (Doc. 22 at

14.) Plaintiff's reply brief also lacks specific argument on the issue. (*See* Doc. 25.) Therefore, the Court concludes Plaintiff has failed to show error on this issue.

## B.  *Domain of Attending and Completing Tasks*

Plaintiff maintains the ALJ erred in not finding a marked limitation in the domain of attending and completing tasks in that the ALJ gave significant weight to the Teacher Questionnaires which indicated serious and very serious problems in this domain and Dr. Tegene's Medical Source Statement which indicated difficulty finishing activities. (Doc. 18 at 14-15.) Defendant responds that the ALJ's finding in this domain is supported by substantial evidence. (Doc. 22 at 17.) The Court concludes Plaintiff has not shown that this claimed error is cause for reversal or remand.

In her supporting brief, Plaintiff states that "[i]t appears that the only basis for the Administrative Law Judge's finding that the Plaintiff did not have an extreme or even marked limitation in attending and completing tasks was because discipline for his failure to function in these areas was relatively mild." (Doc. 18 at 15.) Defendant notes that this is an unfair reading of the record because the ALJ provided a broader analysis of the issue. (Doc. 22 at 17-18.)

Review of ALJ Staller's functional equivalency analysis shows that his determination was based on a broad consideration of the

record.[2]  (R. 16-18, 20-21.)  In general discussion, he extensively reviewed the evidence he considered, appropriately providing specific citation to the relevant record.  (*See* R. 16-18.)  Having found that "the evidence of record did not support the allegations of debilitating conditions regarding the intensity, persistence, and limiting effects" of A.M.'s impairments, ALJ Staller also individually assessed each domain.  (R. 17, 18-25.)  The ALJ's discussion of the domain of attending and completing tasks included the following:

> Social Security regulation 20 CFR 416.926a(h)3)and SSR 09-4p set forth some examples of limited functioning in this domain that children of different ages might have.  The examples do not apply to a child of a particular age; rather, they cover a range of ages and developmental periods. In addition, the examples do not necessarily describe "marked" or "extreme" limitation in the domain.  Some examples of difficulty children could have in attending and completing tasks are: (i) is easy startled, distracted, or over-reactive to everyday sounds, sights, movements, or touch; (ii) is slow to focus on, or fails to complete, activities of interest (e.g. games or art projects); (iii) repeatedly becomes side-tracked from activities or frequently interrupts others; (iv) is easily frustrated and gives up on tasks, including ones he is capable of completing; (v) requires extra supervision to remain engaged in an activity; or (vi) cannot plan, manage time, or organize self in order to complete assignments or

---

[2] Record pages appear to be misnumbered in that contextually page 17 follows page 15, page 16 follows page 17, and page 18 follows page 16 resulting in the page sequence 15, 17, 16, 18.  (R. 15-18.)

chores.

>    The claimant has less than marked
> limitation in attending and completing tasks.
> While the claimant's mother reported that the
> claimant had difficulty focusing and
> completing tasks, she noted that certain
> activities hold his interest longer than
> others. For example, his attention span is
> longer for video games and playing with
> friends than with school work (Testimony).
> The fourth- and fifth-grade teachers noted
> that he tries to find ways to not have to
> complete tasks. However, the teachers
> indicate that he does well with one-on-one
> instruction (Exhibits 4E/6 and 11E/4). The
> treating psychiatrist indicated that he
> became distracted and bored easily (Exhibit
> 2F). The claimant has an IEP and receives
> teaching support that helps him stay on task
> and complete assignments (Exhibit 5F).
> Further, the treating psychiatrist noted
> improvements in his ADHD and ODD (Exhibit
> 3F). The mental health records indicated
> less fidgetiness with medication. (Exhibits
> 1F, 2F, 3F, and 11F). The claimant's mother
> reported an improvement in the claimant's
> attention and behavior when he takes his
> medication (Testimony). Although the
> claimant has some difficulty in attending and
> completing tasks, the undersigned finds that
> the claimant has less than marked limitation
> in this domain. The State agency
> psychologist's assessment supports this
> finding (Exhibit 2A).

(R. 20-21.)

This recitation clearly indicates that Plaintiff
mischaracterizes the basis for the ALJ's conclusion regarding the
domain of attending and completing tasks. Although Plaintiff
correctly notes that the ALJ gave significant weight to teachers'
questionnaires (*see* Doc. 18 at 14-15), a contextual analysis does

not support Plaintiff's claimed errors in that ALJ Staller's explanation of his assessment is more nuanced than Plaintiff posits.

> The undersigned gives significant weight to the teachers' questionnaires because they [are] generally consistent with the education records demonstrating that while the claimant . . . exhibits impulsive and attention seeking behavior, he has shown improvement with medication, behavior modifications, and one-on-one learning as provided in the IEP. He has successfully completed each grade and has avoided serious discipline in school. The undersighed notes that the fifth-grade teacher's finding[] . . . very serious problems in focusing and completing work on an hourly basis appears to be an overestimation of the difficulties in these areas when compared to the education records, the disciplinary records, and the teacher's comments of improvement.

(R. 16.) The quoted text shows that the ALJ did not wholly adopt the teachers' questionnaires and any inference that the "significant weight" attributed to the opinions requires a finding of marked limitation in this domain is not supported by the record.

Plaintiff's reliance on the teacher questionnaires is also misplaced because a child's functioning at school is just one aspect of the functional equivalency inquiry. 20 C.F.R. § 416.926a(b). ALJ Staller's consideration of the domain of attending and completing tasks is consistent with regulatory guidance regarding functional equivalency in that he looked at Plaintiff's functioning at home, at school, and in the community and considered appropriate factors such as the effects of

26

structured and supportive settings, the effects of medications, and school functioning. *See* 20 C.F.R. § 416.926a(b)(1).

Plaintiff's assertion that the assessment of less than marked limitations in this domain is also inconsistent with Dr. Tegene's opinion (Doc. 18 at 16) is not supported by Dr. Tegene's statement on the issue. Dr. Tegene noted difficulties but did not rate their severity with his consideration of the domain of attending and completing tasks where he stated that "[A.M.] has difficulty focusing and staying on task. He gets easily distracted. Has difficulty finishing projects, he gets easily bored." (R. 217.)

Contrary to Plaintiff's assertion that the ALJ's explanation does not allow for reasonable review (Doc. 18 at 16), the Court concludes that the ALJ's detailed analysis provides an adequate basis for review of his findings. Plaintiff has not shown that the ALJ's conclusion that Plaintiff has less than marked limitation in attending and completing tasks is not supported by substantial evidence. Therefore, this claimed error does not provide a basis for reversal or remand.

## C. *Treating Source Opinion*

Plaintiff contends the ALJ erred in failing to accord Dr. Tegene's opinion treating physician weight. (Doc. 18 at 16.) Defendant responds that the ALJ reasonably assessed the opinion as not suggesting a serious limitation in attending and completing

tasks. (Doc. 22 at 21.) The Court concludes Plaintiff has not shown that the claimed error is cause for reversal or remand.

Under applicable regulations and the law of the Third Circuit, a treating medical source's opinions are generally entitled to controlling weight, or at least substantial weight.[3] *See*, *e.g.*, *Fargnoli v. Halter*, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 C.F.R. § 404.1527(c)(2); *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981)). Sometimes called the "treating physician rule," the principle is codified at 20 C.F.R. 404.1527(c)(2), and is widely accepted in the Third Circuit. *Mason v. Shalala*, 994 F.2d 1058 (3d Cir. 1993); *see also Dorf v. Brown*, 794 F.2d 896 (3d Cir. 1986). The regulation addresses the weight to be given a treating source's opinion: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case, we will give it controlling

---

[3] A new regulation regarding weight attributed to a treating source affects cases filed after March 27, 2017. For claims filed after March 27, 2017, 20 C.F.R. § 404.1520c eliminates the treating source rule. In doing so, the Agency recognized that courts reviewing claims have "focused more on whether we sufficiently articulated the weight we gave treating source opinions, rather than on whether substantial evidence supports our decision." 82 FR 5844-01, 2017 WL 168819, *at 5853 (Jan. 18, 2017). This case, filed on October 5, 2016 (Doc. 1), is not affected by the new regulation and is to be analyzed under the regulatory scheme cited in the text.

weight." 20 C.F.R. § 404.1527(c)(2).[4] "A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on continuing observation of the patient's condition over a prolonged period of time." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (citations omitted); *see also Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 355 (3d Cir. 2008). In choosing to reject

---

[4] 20 C.F.R. § 404.1527(c)(2) states in relevant part:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight give your treating source's opinion.

the treating physician's assessment, an ALJ may not make
"speculative inferences from medical reports and may reject a
treating physician's opinion outright only on the basis of
contradictory medical evidence and not due to his or her own
credibility judgments, speculation or lay opinion." *Morales*, 225
F.3d at 317 (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir.
1999); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988)).

Here, ALJ Staller explained his assessment of Dr. Tegene's
opinion as follows:

> The undersigned has considered the April
> 2014 medical source statement of Ben Tegene,
> M.D., the treating psychiatrist, that found
> generally no serious difficulties in the six
> domains. Specifically, Dr. Tegene noted that
> claimant has ADHD with hyperactivity,
> impulsivity, and inattentiveness and has an
> IEP for learning disorder. However, Dr.
> Tegene noted that the claimant learns and
> retains new information, that he has
> difficulty focusing and finishing tasks, that
> he does not comply with rules and tests the
> limits of authority, that he moves about
> well, that he needs to be reminded of self-
> care, and that he is well-developed
> physically (Exhibit 2F). The undersigned
> gives significant weight to the medical
> source statement because Dr. Tegene is a
> treating provider who has had an opportunity
> to observe, examine, and treat the claimant
> over a longitudinal period. Further, the
> assessment is consistent with Dr. Tegene's
> clinical observations and the mental status
> examinations showing less than serious
> functional problems and with the routine and
> conservative treatment that indicated
> improvement in the symptoms following
> medication and with the educational records
> showing successful completion of regular
> classes with an IEP for itinerant learning

> support. Moreover, Dr. Tegene's assessment
> is generally consistent with the claimant's
> daily activities and functional abilities at
> home and at school.

(R. 16, 18.)

First, as discussed above, Plaintiff's reliance on opinion evidence to support a more than marked limitation in the domain of attending and completing tasks is misplaced. Further, while Plaintiff again characterizes Dr. Tegene's findings in the domain of attending and completing tasks as inconsistent with a finding of less than marked limitation in this domain, the only basis provided for doing so is that the ALJ "found that Dr. Tegene's limitations were generally consistent with the limitations assessed by [A.M.'s] teachers." (Doc. 18 at 17-18.) A review of the Decision shows that the ALJ did not find that Dr. Tegene's limitations were generally consistent with those assessed by A.M.'s teachers. Rather, he noted that the opinion was "generally consistent with the claimant's daily activities and functional abilities at home and at school." (R. 18.) As evidenced by the fact that ALJ Staller qualified the weight attributed to one of the teacher opinions as an overestimation of difficulties in the area of functioning and completing tasks when considered in the context of education records, disciplinary records, and teacher's comments of improvements (R. 16), his conclusion that Dr. Tegene's opinion was generally consistent with A.M.'s functional abilities at school is an observation based on more than A.M.'s teachers' opinions.

31

Therefore, even assuming *arguendo* that the teachers' opinions supported marked limitations, no correlation could be made that Dr. Tegene's opinion must be read to support the same.

Considered in context, nothing in the Decision suggests that the ALJ's determination regarding the weight assigned Dr. Tegene's opinion was not supported by substantial evidence. Therefore, Plaintiff has failed to show that the claimed error is cause for reversal or remand.

## D.  *Credibility*

Plaintiff asserts that the ALJ erred in failing to credit A.M.'s statements to his treating physician after finding that A.M. was generally credible.  (Doc. 18 at 18.)  Defendant responds that the ALJ reasonably assessed Plaintiff's limitations.  (Doc. 22 at 25.)  The Court concludes Plaintiff has not shown that this claimed error is cause for reversal or remand.

Plaintiff's premise is flawed in that the ALJ found that "statements concerning the intensity, persistence, and limiting effects of . . . symptoms *are not entirely credible*," later in the Decision adding that A.M.'s and his mother's statements concerning the intensity, persistence, and limiting effects of his symptoms "are *relatively* consistent with the record as a whole and are *generally* credible *to the extent that it supports the functional equivalence domain findings below*."  (R. 17, 18 (emphasis added).) ALJ Staller extensively explained the basis for his assessed

32

credibility limitations (R. 17, 18) and Plaintiff does not refute the evidence cited (*see* Doc. 18 at 18-19) but rather cites evidence which she infers are consistent with finding greater limitations than those assessed by the ALJ (*id.*). Importantly, the Court's review is not concerned with what the ALJ *could have* concluded, the focus is whether his findings are supported by substantial evidence. *See*, *e.g.*, *Hartranft*, 181 F.3d at 360. Because Plaintiff has not shown the ALJ's credibility determination was not based on substantial evidence, she has not shown that the claimed error is cause for reversal or remand.

## V. Conclusion

For the reasons discussed above, the Court concludes Plaintiff's appeal is properly denied. An appropriate Order is filed simultaneously with this Memorandum.

S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge

DATED: August 18, 2017